# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TERRELL ANDRE LOVELACE,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **KILOLO KIJAKAZI,** | : | **No. 20-4925** |
| **Acting Commissioner of Social Security,** | : | |
| **Defendant.** | : | |

## <u>MEMORANDUM OPINION</u>

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                              **4/19/2022**

Plaintiff Terrell Andre Lovelace, in accordance with 42 U.S.C. § 405(g), seeks review of the Commissioner of Social Security's denying his claim for Supplemental Security Income (SSI) under Title XVI of the Social Security Act.  This matter is before me for disposition upon the parties' consent.  For the reasons set forth below, Plaintiff's request for review (ECF No. 18) is **DENIED**.

## I.     PROCEDURAL HISTORY

Plaintiff protectively filed an application for SSI in July 2018, alleging disability beginning January 1, 2018.  (R. 14).  His application was initially denied in January 2019, so he requested a hearing before an Administrative Law Judge (ALJ).  (*Id.*)  Plaintiff appeared with counsel and testified before ALJ Malik Cutlar in August 2019, as did an impartial vocational expert (VE).  (*Id.*)  The ALJ issued an opinion in September 2019 finding Plaintiff not disabled under the Act and denying benefits.  (R. 14–25).  The Social Security Appeals Council then denied Plaintiff's appeal in August 2020, making the denial the Commissioner's final decision. (R. 2).

Plaintiff filed a complaint in this Court in October 2020.  (Compl., ECF No. 1).  The case was initially assigned to the Honorable Timothy R. Rice, United States Magistrate Judge, then reassigned to the Honorable Henry S. Perkin, United States Magistrate Judge.  (Order of Jan. 25, 2021, ECF No. 10).  Plaintiff filed a Brief and Statement of Issues in Support of Request for Review on July 8, 2021.  (Pl.'s Br., ECF No. 18).  The Commissioner filed a Response, and Plaintiff then filed a Reply in August 2021.  (Def.'s Resp., ECF No. 19; Pl.'s Reply, ECF No. 20).  The case was then reassigned to me, and the parties consented to my jurisdiction. (Order of Oct. 6, 2021, ECF No. 21; Soc. Sec. Magistrate Consent, ECF No. 23).

## II.    FACTUAL BACKGROUND

Plaintiff was born on December 21, 1968, and was 49 years old on his alleged disability onset date, placing him in the category of a younger individual 18 to 49 years old.  (R. 23).  After filing his application, he changed age category to closely approaching advanced age.  (*Id.*) Plaintiff has a high school education but no past relevant work.  (*Id.*)  He alleges disability from post-traumatic stress disorder (PTSD), depression, bipolar disorder, and back injuries secondary to gunshot wounds sustained over a decade ago.  (Pl.'s Br. 1, ECF No. 18).

### A.    Medical Evidence

Plaintiff began receiving treatment for his physical impairments in roughly 2006, although there is little evidence of treatment in the record until 2012.  (R. 235–48).  In February of 2014, Plaintiff visited Greater Philadelphia Health Action (GPHA) and was diagnosed with a lumbar sprain, but denied back pain secondary to his gunshot wounds.  (R. 19).  In July 2017, Plaintiff visited Mercy Philadelphia Hospital for an STD check; during this visit, he did not complain of any pain, his musculoskeletal systems were normal on physical examination, and he

was able to rise in a single movement and displayed no loss of balance with steps.  (R. 264).  In September 2018, Plaintiff presented to GPHA with back pain radiating to the legs, which he reported was aggravated by climbing stairs, walking, and standing.  (R. 380).  On physical exam Plaintiff displayed a positive leg raise test bilaterally and positive pain on twisting, and he was diagnosed with lumbago and referred to Mercy Pain Management.  (R. 384).  At a follow-up visit in October 2018, Plaintiff continued to report back pain and was prescribed a back brace.  (R. 376).

On October 15, 2018, Plaintiff visited Mercy Pain Management with complaints of back pain.  (R. 388).  It was noted that Plaintiff walked with assistive device(s), but on physical examination he had a normal gait and station and was ambulating normally.  (R. 389–90).  While Plaintiff frequently used a cane during physician visits, there is no evidence in the record that any physician ever prescribed him a cane.

Dr. Paige McLaughlin noted that Plaintiff had no notable wounds or scars on the low back and no pain with palpation of the lumbar spinous processes or lumbar paravertebrals, but did have pain with facet-loading maneuvers.  (R. 390).  He displayed 5/5 strength in his lower extremities, and he had a negative bilateral straight leg raise.  *Id.*  Dr. McLaughlin scheduled Plaintiff for bilateral medial branch block injections and referred him for aquatic therapy; however, there is nothing in the record suggesting that Plaintiff ever participated in the aqua therapy.  *Id.*  On the same date, Plaintiff underwent a CR spinal lumbar test, which revealed new minimal low grade 1 anterolisthesis of L4 and L5 and mild face osteoarthropathy of the lower lumbar spine.  (R. 405).  The test revealed a single bullet overlying the right back.  *Id.*  On October 26, 2018, Plaintiff received bilateral lumbar medial branch block injections at L4-L5 and L5-S1.  (R. 402).  Plaintiff underwent additional branch block injections in May of 2019.  (R.

441).

 Plaintiff also received psychiatric treatment for his mental health impairments at GPHA. In a February 2017 visit, Plaintiff reported experiencing suicidal thoughts but attributed them to being off his medications. (R. 371). He explained that "only during periods of missing medications does he feel suicidal." (R. 371). At a May 2017 appointment, Plaintiff denied feeling depressed and reported taking his medications as prescribed. (R. 298). At an August 2017 appointment, Plaintiff reported experiencing minimal flashbacks and nightmares from his PTSD. (R. 300). Though he still had such episodes occasionally, they were less intense at that time than they had been in the past. (R. 300). He also reported being generally able to control his anger—though he still occasionally "snap[ped]" at people, he was "learning to control it." (R. 300). In September 2017, Plaintiff reported being angry but explained that he was dealing with acute stress at the time and denied problems with his medications. (R. 302). In fact, he reported that his nightmares had lessened and that his mood had improved since the August 2017 appointment. (R. 302). At a November 2017 appointment, Plaintiff reported that his medications were working and that he was sleeping well. (R. 303). He also reported that he rarely has panic attacks, and when he does, they are "nothing like they used to be." (R. 303). Plaintiff denied experiencing nightmares or flashbacks. (R. 303).

 In January 2018, Plaintiff's psychiatrist Dr. Ralph noted that Plaintiff was in a good mood, denied being depressed, and was eating and sleeping well. (R. 304). At that appointment, Dr. Ralph explained that the practice had a new policy under which they would no longer prescribe Xanax as a maintenance medication. (R. 304). Despite having taken Xanax as such for seven years, Plaintiff apparently reacted well to this news, agreeing that he would begin weaning off Xanax after his next appointment with Dr. Ralph. (R. 300, 304). In May 2018,

Plaintiff presented in a labile, tearful mood.  (R. 306).  Plaintiff reported that his nephew had just

been shot, but he "denie[d] feeling depressed" and instead reported that he was "just shocked"

and "very overwhelmed with his life."  (R. 306).  (R. 368–70).

Plaintiff also attended psychotherapy sessions at GPHA.  At an August 2017

appointment, Plaintiff's therapist Mr. Addy documented that Plaintiff "looked very sad" upon

arrival and reported feeling "angry, frustrated, and hopeless" because his children's mother was

"play[ing]" with "his emotions."  (R. 290).  Though Plaintiff "intermittently cried" during the

session, he was ultimately "receptive to support and having a different perspective on life's

challenges."  (R. 291).  At a September 2017 appointment, Mr. Addy reported that Plaintiff was

experiencing bereavement regarding the death of his prior therapist but that Plaintiff "was able to

process the loss."  (R. 286).  Plaintiff reported at this appointment that he has had "a bad temper

all his life and experiences feelings of anger and outbursts [seven days a week] most of the day."

(R. 288).  In November 2017, Plaintiff reported experiencing "a lot of stress" because his mother

had left him several properties when she passed away, and "the city [was] giving him the run

around" as he was trying to "obtain" those properties and his mother's pension.  (R. 284).  He

"report[ed] feeling frustrated, irritable, and depressed at times due to the situation."  (R. 284).

In January 2018, Plaintiff "report[ed] feeling a little bit better" but was still experiencing

acute stress, this time because his grown children who lived with him refused to contribute to the

household expenses.  (R. 281).  Mr. Addy noted that Plaintiff "seemed confident about handling

the situation without anger."  (R. 282).  The next record is from May 2018, when Plaintiff

reported feeling depressed about the deaths of his mother and son, his son having been killed on

Plaintiff's mother's birthday, and also reported being isolated.  (R. 279–80).  In June 2018,

Plaintiff reported being frustrated with a family member's being less than honest with him.

5

(R. 278).  Plaintiff reported wanting to hurt this family member but denied that he would actually do so.  (R. 278–79).  Nonetheless, Mr. Addy was concerned enough to contact this family member directly to warn her.  (R. 279).  On August 10, 2018, Plaintiff expressed frustration with his chronic back pain.  (R. 275).  According to Mr. Addy, Plaintiff "looked tired, but was engaged.  He committed to attending his appointment and looks forward to complying with treatment—therapy and medication."  (R. 276).  In August 14, 2018, Plaintiff "appeared depressed and shared being in [pain]."  (R. 273).

### B.    Physician Opinions

In addition to treatment notes, the medical record also contains opinions authored by Plaintiff's treating physicians, consultative examiners, and state agency reviewing physicians.

### 1.    Abby Neely, CRNP, State Agency Consultative Examiner

Plaintiff was examined in December 2018 by state agency consultative examiner Abby Neely, CRNP, who provided records from her examination and completed a Medical Source Statement.  (R. 409–21).  Ms. Neely noted that Plaintiff "required no help changing for exam, could get on and off the table without difficulty, and arise from chair without difficulty." (R. 411).  She described Plaintiff's gait during the exam as indicative of some mobility restrictions: "[Plaintiff] declined to walk without his cane.  In the [exam] room he was extremely bent over at a 70-degree angle, walking very slowly and cautiously.  He declined to walk on heels and toes.  He did 50% of a full squat."  (R. 411).  However, after the exam, "when [Plaintiff] was leaving the room, his gait was markedly improved.  He was walking straight up with very little weight on his cane."  (*Id.*)

Ms. Neely also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical).  (R. 414–19).  She opined that Plaintiff can frequently lift or carry up to ten

pounds, but never more.  (R. 414).  She also opined that Plaintiff can sit four hours at a time and

stand or walk one hour at a time.  (R. 415).  Additionally, Plaintiff can sit eight hours total during

an eight-hour workday, and he can stand two hours and walk two hours during an eight-hour

workday.  (R. 415).  Ms. Neely noted that Plaintiff "require[s] the use of a cane to ambulate,"

that he can walk two blocks without his cane, and that she could not determine whether "the use

of a cane [is] medically necessary" because Plaintiff refused to walk without it during the exam.

(R. 415).  Regarding Plaintiff's extremities, Ms. Neely opined that Plaintiff can use both hands

frequently for reaching, handling, fingering, feeling, pushing, and pulling, and that he can use

both feet continuously to operate foot controls.  (R. 416).  Plaintiff can also frequently balance

and climb stairs and ramps, occasionally stoop, and never kneel, crouch, crawl, or climb ladders

or scaffolds.  (R. 417).  Though Plaintiff can only occasionally tolerate unprotected heights,

moving mechanical parts, and operating a motor vehicle, he can continuously tolerate humidity

and wetness; dust, odors, fumes, and pulmonary irritants; extreme cold and heat; and vibrations.

(R. 418).  Finally, Ms. Neely opined that the limitations she identified had not lasted, and would

not last, 12 consecutive months.  (R. 419).

## 2.    LeeAnn Tanaka, DO, Primary-Care Physician

Plaintiff's primary-care physician LeeAnn Tanaka, DO, furnished records from a May

2019 examination of Plaintiff, and she completed both a Physical Impairment Questionnaire and

an Onset Questionnaire.  (R. 481–83, 488–93).  Dr. Tanaka wrote in her treatment notes that

Plaintiff presented her with both questionnaires at the May 2019 appointment, which was the

first time she had ever treated Plaintiff, and that he previously had poor follow-up with other

providers from her office.  (R. 492).  She informed him that because of this, the questionnaires

would be "difficult to fill out," but that she would do so "to the best of [her] ability."  (*Id.*)

Dr. Tanaka opined in the Onset Questionnaire that Plaintiff's symptoms had been present since August 2018. (R. 483). In the Physical Impairment Questionnaire, Dr. Tanaka listed Plaintiff's diagnoses as lumbar spondylosis[1] and chronic venous insufficiency, and she explained that these conditions result in "low back pain, ambulat[ion with] cane, radiation of pain to b/l legs (upper)."[2] (R. 481). These symptoms "frequently" "interfere with the attention & concentration required to perform simple work-related tasks." (*Id.*) Prompted to describe "the side effects of any medications which may impact [Plaintiff's] ability to work," Dr. Tanaka wrote that Plaintiff experiences "difficulty standing . . . for prolonged periods without breaks, unable to do heavy lifting." (*Id.*) According to Dr. Tanaka, Plaintiff in total can sit six hours and stand or walk four hours with regular breaks during an eight-hour workday, but he can neither sit, stand, nor walk more than 20 minutes at once. (*Id.*) He would also need an unscheduled 5- to 10-minute break every 30 to 60 minutes throughout the workday. (*Id.*)

Specifically regarding Plaintiff's functional capacity, Dr. Tanaka opined that Plaintiff can occasionally lift up to 10 pounds and never lift more than 20 pounds, but that he has no "limitations in doing repetitive reaching, handling or fingering." (R. 482). Though she predicted that Plaintiff will likely miss work three to four times per month, Dr. Tanaka also opined that Plaintiff is "physically capable of working an 8 hour day, 5 days a week employment on a sustained basis" "with appropriate breaks." (*Id.*)

---

[1] "Lumbar spondylosis is an age-related degeneration of the vertebrae and disks of the lower back. These changes are often called degenerative disk disease and osteoarthritis." *Lumbar Spondylosis (Degeneration)*, UT Health Neurosciences (Jan. 31, 2022, 2:32 p.m.), https://med.uth.edu/neurosciences/conditions-and-treatments/spine-disorders-and-back-pain/lumbar-spondylosis-degeneration/.

[2] "B/l" presumably means "bilateral."

### 3.      Pamela Ralph, MD, Psychiatrist

Plaintiff's psychiatrist at GPHA, Pamela Ralph, MD, completed a Physical Assessment questionnaire in August 2018 in which she opined that Plaintiff's physical symptoms are "[c]onstantly" "severe enough to interfere with the attention & concentration required to perform simple work-related tasks." (R. 270).  According to Dr. Ralph, Plaintiff experiences drowsiness as a side effect of his mental health medications.  (*Id.*)  Plaintiff would need more breaks than a typical worker and could neither sit, stand, nor walk more than one hour total during an eight-hour workday.  (*Id.*)  Dr. Ralph also felt that Plaintiff would need a 15- to 30-minute break every 15 minutes.  (*Id.*)  She opined that Plaintiff could occasionally lift less than 10 pounds, and though the questionnaire also asked her to state how often Plaintiff could lift 10, 20, or 50 pounds, she left those answers blank.  (*Id.*)

Dr. Ralph placed significant limits on Plaintiff's ability to engage in "repetitive reaching, handling or fingering."  (*Id.*)  The questionnaire asked Dr. Ralph to identify the percentage of an eight-hour workday that Plaintiff could engage in "[g]rasp[ing], turn[ing, or] twist[ing] objects" with his hands, "fine manipulation" with his fingers, and "reaching" with his arms.  (*Id.*) Dr. Ralph limited Plaintiff's right-hand use to five percent and his left-hand use to two percent of an eight-hour workday.  (*Id.*)  She also limited Plaintiff's right-hand finger use to five percent and his left-hand finger use to three percent of an eight-hour workday.  (*Id.*)  Additionally, she limited Plaintiff's right arm use to three percent and his left arm use to two percent of an eight-hour workday.  (*Id.*)  Last, she opined that Plaintiff would miss work more than four times per month.  (R. 271).

### 4.      Editus Addy, MSW, Psychotherapist

Plaintiff's psychotherapist Editus Addy, MSW, also from GPHA, completed a Mental

Health Questionnaire opining on Plaintiff's mental limitations.  (R. 273–93, 308, 311–61, 475–79).

Regarding Plaintiff's understanding and memory, Mr. Addy opined that Plaintiff has marked limitations in his ability "to remember locations and work-like procedures," "to understand and remember very short and simple instructions," and "to understand and remember detailed instructions."  (R. 475).  Regarding sustained concentration and persistence, Plaintiff has marked limitations in his ability "to carry out very short and simple instructions," "to carry out detailed instructions," "to maintain attention and concentration for extended periods," "to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," "to work in coordination with or in proximity to others without being distracted by them," "to complete a normal workday without interruptions from psychologically based symptoms," and "to perform at a consistent pace with a standard number and length of rest periods."  (R. 475).  He also has moderate limitations in his ability "to sustain an ordinary routine without special supervision" and "to make simple work-related decisions."  (R. 475).

Regarding social interactions, according to Mr. Addy, Plaintiff has marked limitations in his ability "to interact appropriately with the general public," "to accept instructions and respond appropriately to criticism from supervisors," and "to get along with coworkers or peers without distracting them or exhibiting behavioral extremes."  (R. 476).  He also has a moderate limitation in his ability "to ask simple questions or request assistance" and a slight limitation in his ability "to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness."  (R. 476).  Regarding adaptation, Plaintiff has a marked limitation in his ability "to respond appropriately to changes in the work setting."  (R. 477).  He has moderate limitations in his ability "to travel in unfamiliar places or use public transportation" and "to set realistic goals

10

or make plans independently of others," and he has no limitation in his ability "to be aware of normal hazards and take appropriate precautions." (*Id.*) The result, according to Mr. Addy, is that Plaintiff will miss at least four days of work per month. (R. 476).

### 5. Michael Brown, DO, Non-Examining State Agency Consultant

Michael Brown, DO, a non-examining state agency consultant, also furnished an opinion on Plaintiff's physical impairments. (R. 76–78). Dr. Brown found Plaintiff capable of lifting and carrying up to 20 pounds occasionally and 10 pounds frequently. (R. 76). He also opined that Plaintiff in total could stand or walk for six hours, and sit for six hours, with regular breaks during an eight-hour workday. (R. 76–77). Dr. Brown assigned no limits for pushing and pulling "other than shown," but he does not explain what "other than shown" means. (R. 77). He additionally found that Plaintiff has no postural, manipulative, visual, communicative, or environmental limitations. (*Id.*)

Dr. Brown summarized the medical evidence he reviewed, placing particular emphasis on Plaintiff's changed gait following Ms. Neely's exam and calling it "feigned behavior." (R. 77–78). He also labeled "interesting[]" that Plaintiff "needed no help changing for exam or getting on and off the exam table." (R. 78). Specifically regarding Ms. Neely's opinion, Dr. Brown believed her opinion "inconsistent but appeared to be based on cane requirement which the [medical evidence of record] does not support. The opinion appeared to be based on the subjective complaints of [Plaintiff] rather than the objective findings on exam or the [medical evidence of record]." (*Id.*) Last, he asserted that the limitations he assigned were "supported in the [medical evidence of record]." (*Id.*)

### 6. Richard Small, PhD, Non-Examining State Agency Consultant

Finally, Richard Small, PhD, a non-examining state agency consultant, opined on

11

Plaintiff's mental impairments.  (R. 78–80).  Dr. Small found that Plaintiff had no limitations in his understanding or memory.  (R. 79).  Regarding concentrating and persisting, Dr. Small found that Plaintiff had a moderate limitation in his ability to maintain attention and concentration for extended periods, but that Plaintiff had no significant limitations in his ability to carry out very short and simple instructions, carry out detailed instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods.  (R. 79).

Regarding social interactions, Dr. Small opined that Plaintiff had moderate limitations in his ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors, but that Plaintiff had no significant limitations in his ability to ask simple questions, request assistance, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness.  (R. 79–80).  Regarding adaptation, Dr. Small felt that Plaintiff had a moderate limitation in his ability to travel in unfamiliar places or use public transportation, but that he had no significant limitations in his ability to respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, and set realistic goals and make plans independently of others.  (R. 80).  Dr. Small explained that Plaintiff "fears going outside and is not sociable. . . . Based on the evidence of record, [Plaintiff's] statements are found to be partially consistent with the evidence.  [Plaintiff] is able to meet the basic mental demands of simple, routine tasks on a sustained basis despite the

limitations." (*Id.*)

      **C.**    **Lay Evidence**

Plaintiff testified at the administrative hearing in August 2019.  He stated that he resides

with his fiancée and his adult daughter in a two-story rowhome.  (R. 43).  He also testified that

he has not worked since 2006.  (R. 46).  Before that, Plaintiff worked as a cook in a few

restaurants.  (*Id.*)  But he has not looked for work since 2006 because he "can't lift and [he] ha[s]

a problem bending."  (*Id.*)

Regarding his physical impairments, Plaintiff was the victim of a shooting in about 2009,

during which he reportedly suffered 13 gunshot wounds.  (R. 196, 389).  Plaintiff testified at the

August 2019 hearing that he experiences "enormous" lower back pain secondary to "two bullets

on [his] spine."[3]  (R. 36, 39).  He reported that his doctors are reluctant to remove the bullet(s)

surgically because of the high risk that doing so might paralyze him.  (R. 45).  Plaintiff also

reported receiving two lumbar branch block injections[4] in 2018 and 2019 to alleviate his back

pain, but any relief from those procedures wore off within about 12 hours.  (R. 39, 425, 441).  He

has lumbar spondylosis and wears a back brace, which "eases the pain a little bit."  (R. 42, 47,

---

[3] The record is unclear on how many bullets remain in Plaintiff's body.  Plaintiff reported being shot 13 times, and some of his medical records support that doctors removed 11 bullets from his body.  (R. 196, 389).  This accords with Plaintiff's claim that two bullets remain lodged in his back.  Other records suggest that x-rays in 2018 revealed only one bullet remaining in his back.  (R. 46, 405).  And though Plaintiff claimed to have undergone surgery in late 2018 to attempt to remove the bullets, the record does not corroborate this.  (R. 409).

[4] A medial branch block "is an injection of local anesthetic and steroid . . . placed outside the joint space near the nerve that supplies the joint called the medial branch." *Facet and Medial Branch Blocks*, Brigham and Women's Hospital (Jan. 31, 2022, 12:49 p.m.), https://www.brighamandwomens.org/anesthesiology-and-pain-medicine/pain-management-center/facet-and-medial-branch-blocks.

425).  Plaintiff also suffered five stab wounds to both forearms during a June 2016 robbery.

(R. 39–40, 366).  Plaintiff wears a wrist brace on his right arm "[b]ecause [his] wrist and [his]

hands flare up" as a result of the stabbings.  (R. 40).  He described experiencing pain in the area,

and his "nerves constantly jump in [his] hands."[5]  (*Id.*)  Plaintiff also underwent surgery in 2019

to correct varicose veins in his right leg, and he wears compression stockings on both legs.

(R. 42–44, 449).  Plaintiff testified that he walks with a cane, has difficulty climbing and

descending stairs, and braces himself on furniture to move about his home.  (R. 38, 42–44).

Regarding his mental health impairments, Plaintiff testified that his PTSD relates to

multiple tragedies and traumas he experienced throughout his life. In addition to the gunshot

wounds and stab wounds described above, Plaintiff testified that he killed someone at age 14 and

spent 17 years in prison.  (R. 317).  He suffers from "recurring memories of the experience and

nightmares."  (*Id.*)  Additionally, according to Plaintiff, the man who shot him in 2009

continually harassed him thereafter, apparently having escaped the legal consequences of the

shooting.  (R. 294–95).  Plaintiff experienced bereavement following his mother's death in 2015.

(R. 48, 280).  Plaintiff's 13-year-old son was killed on Plaintiff's mother's birthday, though the

record does not indicate the year that happened.  (R. 279–80).  Plaintiff's nephew was also shot

in front of his own grandmother.  (R. 306).  The result, according to Plaintiff, is that he does not

"want to be outside" or "around people," and that he feels "sad and irritable and hopeless all

day."  (R. 42).  Plaintiff treats his mental health conditions with a few different medications.

(R. 41).  He reported taking these medications as prescribed and denied that they cause side

---

[5]  This contradicts what Plaintiff apparently told Ms. Neely.  According to Ms. Neely,
Plaintiff "state[d] that he has no residual symptoms from [the stabbing]."  (R. 410).

14

effects.  (R. 41–42, 195).

## III.   LEGAL STANDARD

A claimant seeking SSI must show that they are disabled, meaning they cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  The Commissioner uses a five-step sequential analysis to evaluate disability claims:

> First, the Commissioner must determine whether the claimant has engaged in substantial gainful activity since his alleged disability onset date.  If not, the Commissioner next determines whether the claimant has an impairment or combination of impairments that is severe.  If the claimant has a severe impairment, the Commissioner considers whether the impairment meets the criteria of an impairment listed in Appendix 1 of 20 C.F.R. part 404, subpart P (the "Listings") or is equal to a listed impairment. If so, the claimant is automatically eligible for benefits; if not, the Commissioner proceeds to step four.  In step four, the Commissioner determines whether, despite the severe impairment, the claimant retains the residual functional capacity to perform his past relevant work.  The claimant bears the ultimate burden of establishing steps one through four.  At step five, the burden of proof shifts to the [Commissioner] to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity.

*Poulos v. Comm'r. of Soc. Sec.*, 474 F.3d 88, 91–92 (3d Cir. 2007) (citations omitted).

Judicial review of a final decision of the Commissioner is limited. The Commissioner's factual findings bind the district court if substantial evidence supports them and the Commissioner applied correct legal standards.  42 U.S.C. § 405(g); *Zirnsak v. Colvin*, 777 F.3d 607, 610–11 (3d Cir. 2014).  Substantial evidence is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion.  It is more than a mere scintilla but may be somewhat less than a preponderance of the evidence."  *Zirnsak*, 777 F.3d at 610 (internal quotation marks and citations omitted).  Even if the record could support a contrary conclusion, the Court cannot overrule the ALJ's decision if substantial evidence supported it.  *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986) ("While there is other evidence in the record that could support a finding of disability . . . , our inquiry is not whether the ALJ could have reasonably made a different finding based on this record."); *Kushner v. Comm'r of Soc. Sec.*, 765 Fed. App'x 825, 828 (3d Cir. 2019) (unreported) ("Under substantial evidence review, we are not permitted to reweigh the evidence or impose our own factual determinations.") (internal quotation marks and modifications omitted).  This Court has plenary review of legal issues.  *Zirnsak*, 777 F.3d at 611.

## IV.   ALJ'S DECISION

Using the five-step inquiry outlined above, the ALJ made the following findings of fact:

1.  The claimant has not engaged in substantial gainful activity since July 27, 2018, the application date.

2.  The claimant has the following severe impairments:  remote history of gunshot and stab wounds; minimal grade 1 anterolisthesis of L4 and L5; mild facet osteoathropathy [sic] of the lower lumbar spine; post-traumatic stress disorder ("PTSD"); and depressive disorder.

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4.  [T]he claimant has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, sit for 6 hours with alternating to standing for 10 minutes after every hour of sitting, stand for 6 hours with alternating to sitting for 10 minutes after every hour of standing, and walk for six hours with alternating to sitting for 10 minutes after every hour of walking.

He can frequently balance, stoop, crouch, and climb ramps and stairs, but he can never climb ladders, ropes, and scaffolds. He can never work in extreme cold. The claimant is able to perform simple and routine tasks and make simple work-related decision [sic]. The claimant can have occasional interaction with supervisors and co-workers. He can only rarely interact with the public. Rare is defined as less than occasional, but more than never. The claimant is able to tolerate occasional changes in a routine work setting.

5.  The claimant has no past relevant work.

6.  The claimant was born on December 21, 1968 and was 49 years old, which is defined as a younger individual age 18–49, on the date the application was filed. The claimant subsequently changed age category to closely approaching advanced age.

7.  The claimant has at least a high school education and is able to communicate in English.

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work.

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10. The claimant has not been under a disability, as defined in the Social Security Act, since July 27, 2018, the date the application was filed.

(R. 16–24). Accordingly, the ALJ found that Plaintiff was not disabled. (R. 25).


## V.   DISCUSSION

Plaintiff advances two arguments why substantial evidence does not support the ALJ's determination of his residual functional capacity (RFC) at step four of the sequential evaluation. First, Plaintiff argues that the ALJ improperly considered the opinions of Ms. Neely, Dr. Tanaka, and Dr. Ralph in determining Plaintiff's physical RFC. Second, Plaintiff argues that the ALJ improperly considered the opinion of Mr. Addy in determining Plaintiff's mental RFC. I address each issue in turn below.

The Commissioner modified Social Security's regulations in 2017, changing the way ALJs evaluate medical evidence. The prior regulations, which govern claims filed before March 27, 2017, divided medical sources into three categories:  treating, examining, and non-examining. *See* 20 C.F.R. § 416.927(c). ALJs were to weigh each medical opinion and could sometimes afford controlling weight to opinions from treating sources. *See id.*

Under the new regulations, ALJs do not place medical sources into these categories and can no longer afford controlling weight to any opinion. *See id.* at § 416.920c(a). Instead, ALJs now evaluate the persuasiveness of each medical opinion and each prior administrative medical finding. *See id.* Five factors determine persuasiveness:  (1) supportability; (2) consistency; (3) relationship with the claimant, including length, purpose, and extent of the treatment relationship, as well as frequency of examinations and whether the medical source examined the claimant firsthand; (4) specialization; and (5) other factors, like "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." § 416.920c(c). Supportability and consistency are the most important factors. § 416.920c(b)(2). ALJs must discuss supportability and consistency, but need not explain their determinations regarding the other factors. *Id.*

Regarding supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." § 416.920c(c)(1). Regarding consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." § 416.920c(c)(2).

18

A.        **Physical RFC**

Plaintiff first contends that the ALJ improperly considered the opinions of Ms. Neely,

Dr. Tanaka, and Dr. Ralph in determining Plaintiff's physical RFC, and he argues that the ALJ

did not adequately explain his conclusions regarding supportability and consistency.  (Pl.'s Br. 3–

12, ECF No. 18).  The Commissioner responds that the ALJ reasonably identified inconsistencies

in the medical records and properly relied on those inconsistencies in denying Plaintiff's claim.

(Def.'s Resp. 8–14, ECF No. 19).

In his decision, the ALJ found Ms. Neely's opinion unpersuasive because it was:

> inconsistent with the unremarkable physical examination results and
> with the mild diagnostic findings regarding the claimant's lumbar
> spine.  Ms. Neely also made assessments even though the claimant
> did not fully cooperate with the examination by refusing to walk
> without his cane.  She noted the claimant walked upright and barely
> used his cane when exiting the examination room, but then
> inconsistently opined the claimant still needed a cane to ambulate.
> Nurse Neely further confused this assessment by stating the
> limitations have not lasted, nor would last, for 12 consecutive
> months.  All the alleged limitations are therefore put into doubt as to
> whether they reflect severe on-going impairments, as opposed to
> being acute issues that are expected to resolve and/or be resolved
> within one year.  Overall, Ms. Neely's opinion is simply unhelpful
> to the analysis.

(R. 22).  The ALJ also found Dr. Tanaka's opinion unpersuasive because:

> [i]t was completed by a doctor after only one examination of the
> claimant and Dr. [Tanaka] readily admitted that the claimant had
> poor follow-up prior to "surgeries."  More importantly, the opinion
> is not consistent with the treatment evidence showing only minimal
> diagnostic findings and unremarkable examination findings.

(R. 22–23).  Finally, the ALJ found Dr. Ralph's opinion unpersuasive because:

> Dr. Ralph opined on a matter outside the area of her medical
> expertise.  She only references PTSD for a diagnosis, which does
> not account for the physical limitations on the form.  In addition, the
> medical records, including the mild diagnostic test results of the

19

> claimant's lumbar spine, do not support the functional limitations in
> the opinion.

(R. 22).

## 1.      Supportability and Consistency

First, Plaintiff argues that, though the ALJ explicitly discussed the consistency of the

three physician opinions, he erred by not explicitly discussing supportability.  (Pl.'s Br. 6, ECF

No. 18).  However, the ALJ is not required to use any particular language in reaching his

decision.  *Ratliffe v. Comm'r of Soc. Sec. Admin.*, No. 21-1622, 2022 WL 596302, at *2 (E.D. Pa.

Feb. 28, 2022).  Reading the ALJ's decision as a whole demonstrates that the ALJ clearly

discussed the both the consistency and the supportability of the medical opinions, regardless of

whether the precise word "supportability" was used.

Plaintiff asserts that "[a]side from [a] single statement that [Ms.] Neely's opinion is

inconsistent, the ALJ fails to adequately discuss supportability and consistency. . . .  The ALJ

never provided any analysis of the supportability factor as provided by the regulations, which

was error."  (Pl.'s Br. 6, ECF No. 18 (citing R. 22)).  However, as discussed *infra* Section V.A.2.,

the ALJ comprehensively detailed the record medical evidence and found that Plaintiff's

conservative treatment and generally normal results on examination did not support Ms. Neely's

opinion.  (R. 19–23).  Additionally, the ALJ explained that Ms. Neely's opinion found

insufficient support in her physical examination because Plaintiff did not fully cooperate with the

exam and was not displaying his "best effort."  (R. 22, 420–21).  The ALJ's discussion of the

opinion's inconsistency with Neely's own examination notes and lack of support from the rest of

the medical record fulfils the required supportability analysis, and is enough to allow meaningful

judicial review.  *See Ratliffe,* 2022 WL 596302 at *2–5.

20

### 2.     Weight of the Medical Opinions

Plaintiff also argues that the ALJ improperly evaluated the opinions of Ms. Neely,

Dr. Tanaka, and Dr. Ralph.  Turning first to Ms. Neely, the ALJ reasonably found her opinion

"unhelpful," because she opined that Plaintiff's impairments had not lasted—and would not

last—at least 12 consecutive months.  (R. 22, 419).  If a claimant's disability will not last 12

months, that claimant is not disabled as a matter of law.  42 U.S.C. § 1382c(a)(3)(A).  Hence

taking Ms. Neely's opinion alone and at face value, Plaintiff is not disabled under the Act.

Duration aside, substantial evidence supports the ALJ's rejecting Ms. Neely's opinion as

inconsistent with the other medical evidence of record and as unsupported by her own

observations of Plaintiff.  Besides Plaintiff's gait during the exam, the presence of gunshot and

stab wounds, and some range-of-motion limitations, Ms. Neely documented no abnormal

findings.  (R. 409–13).  This contradicts the limitations she then assigned in her Medical Source

Statement.  For instance, regarding Plaintiff's fine motor activity, Ms. Neely found Plaintiff's

"[h]and and finger dexterity intact.  Grip strength 5/5 bilaterally.  The claimant can button, zip,

and tie." (R. 412).  Then in her Medical Source Statement, Ms. Neely limits all hand use to

frequent—contradicting her documented finding that Plaintiff has no issues with hand use.

(R. 416).  Her report included a Range of Motion Chart that appears to show some restrictions in

Plaintiff's range of motion, yet that same chart documents her belief that those findings "[m]ay

not be claimant's best effort." (R. 420–21).

Ms. Neely also limited the amount of time Plaintiff can sit, stand, or walk, but her lack of

abnormal findings during the exam undermines her opinion that Plaintiff would need a 15- to 30-

minute break every 15 minutes.  (R. 411, 415).  Given Ms. Neely's consistently normal findings,

her exam notes do not support these limitations, and the ALJ was justified in finding her opinion

unpersuasive.

Finally, while Plaintiff argues that the ALJ improperly interpreted raw medical data by describing Plaintiff's diagnostic test results as "mild," this is simply not the case. The report from Plaintiff's X-ray explicitly states that Plaintiff displayed "[m]inimal grade 1 anterolisthesis of L4 on L5" and "[m]ild loss of intervertebral disc height at L5-S1." (R. 405). This reflects the physician's interpretation of the raw medical data, not the ALJ's, and it was not error for the ALJ to rely on that finding.[6]

Substantial evidence also supports the ALJ's evaluation of Dr. Tanaka and Dr. Ralph's opinions. Dr. Tanaka had never evaluated Plaintiff before giving her opinion in this case, and she noted that Plaintiff had poor follow-up with other physicians in her practice who had evaluated him years earlier. (R. 492). The ALJ properly considered the length of the treating relationship in deciding how persuasive he found Dr. Tanaka's opinion, and he sufficiently explained why he found her opinion unpersuasive. *See* § 416.920c(c)(3); (R. 22–23 (noting that Dr. Tanaka gave her opinion "after only one examination of [Plaintiff]" and "readily admitted that [Plaintiff] had poor follow-up prior to 'surgeries.'")).

Additionally, Dr. Ralph's opinion concerned only Plaintiff's physical impairments—but

_____

[6] Plaintiff also challenges the ALJ's assessment of Ms. Neely's opinion in light of the vocational expert's testimony. (Pl.'s Br. 11–12, ECF No. 18). According to the VE, a finding that Plaintiff needs a cane to balance would eliminate Plaintiff's ability to perform light work. (R. 51–52). But as explained above, the evidence whether Plaintiff requires a cane for balance is mixed. The marked change in Plaintiff's gait following Ms. Neely's exam, plus the contradictory explanations Plaintiff offered for it, are substantial evidence to support the ALJ's finding that Plaintiff does not "need[] his cane for standing and uses it only as a minimal aid for ambulation." (R. 21). Once the ALJ rejected Ms. Neely's finding that Plaintiff requires a cane for ambulation, he was not required to then accept that finding in considering the vocational expert's testimony.

Dr. Ralph is a psychiatrist, not an internal-medicine practitioner like Ms. Neely and Dr. Tanaka.[7]

As explained above, the physical limitations Dr. Ralph assigned were generally far more

restrictive than those Ms. Neely and Dr. Tanaka assigned.  (R. 270–71).  She opined that Plaintiff

could sit no more than one hour total and that he could stand or walk no more than one hour total

during an eight-hour workday.  (R. 270).  Dr. Ralph opined on issues outside her expertise—and

reached a conclusion far more restrictive than those of the practitioners opining *within* their

expertise.  So too here, the ALJ could consider the medical source's specialty in evaluating

persuasiveness, and he sufficiently explained his conclusions in this regard.  *See*

§ 416.920c(c)(4); (R. 22 (noting that "Dr. Ralph opined on a matter outside the area of her

medical expertise" and that her PTSD diagnosis "does not account for the physical limitations"

she assigned)).  Dr. Ralph opined that Plaintiff experiences drowsiness from his medications, but

Plaintiff denied this at the August 2019 hearing.  (R. 42, 270).

Finally, as the ALJ explained, the objective evidence in the medical record contradicts the

restrictive limitations imposed by Ms. Neely, Dr. Tanaka, and Dr. Ralph.  The record reflects that

Plaintiff received only limited treatment for his physical impairments, making infrequent

physician visits, being prescribed medication, and receiving two branch block injections.  (R. 19,

376, 380, 388–90).  He was referred to aquatic therapy but did not attend any sessions.  (R. 20).

During visits in 2014 and 2017, Plaintiff did not complain of any back pain at all.  (R. 19–20,

264).  And later physical examinations revealed normal findings, including normal gait, normal

ambulation, normal grip strength, and normal strength in the lower extremities.  (R. 389–90).

---

[7] There is no explanation given in the administrative record or the parties' briefs for Dr. Ralph's decision to opine on Plaintiff's physical impairments rather than his mental impairments.

23

Finally, the X-ray diagnostic testing of Plaintiff's back revealed only minimal low grade 1 anterolisthesis of L4 and L5 and mild face osteoarthropathy of the lower lumbar spine. (R. 405). This supports the ALJ's finding that Plaintiff received only limited conservative treatment for his back pain, which was inconsistent with the restrictive limitations imposed by Ms. Neely and Drs. Tanaka and Ralph.

Substantial evidence supports the ALJ's evaluation of the medical opinions. Accordingly, Plaintiff's request for review on this ground is denied.

### B.   Mental RFC

Additionally, Plaintiff argues that the ALJ improperly considered the opinion of Mr. Addy, Plaintiff's psychotherapist, in determining Plaintiff's mental RFC. (Pl.'s Br. 12–16, ECF No. 18). The ALJ found Mr. Addy's opinion "unpersuasive because it is inconsistent with [Plaintiff's] mental health records." (R. 23). Plaintiff argues the ALJ again failed to adequately discuss in his opinion the consistency and supportability of Mr. Addy's assigned limitations. (Pl.'s Br. 14, ECF No. 18). The Commissioner responds that "the ALJ's detailed consideration of the mental health evidence was accurate as described." (Def.'s Resp. 14, ECF No. 19). I agree with the Commissioner.

"An ALJ may weigh the conflicting medical evidence of record and draw her own inferences . . . [and] may reject the opinion of a treating physician when it is unsupported and inconsistent with the other evidence in the record." *Brunson*, 704 Fed. App'x at 59 (internal quotation marks and brackets omitted); *see also Brown v. Astrue*, 649 F.3d 193, 196 (3d Cir. 2011) (noting that even if some "record evidence . . . suggest[s] a contrary conclusion, the ALJ is entitled to weigh all evidence in making [his] finding" (footnote omitted)). An ALJ may reject treating providers' opinions "on the basis of contradictory medical evidence" but may not do so

based on the ALJ's "own credibility judgments, speculation or lay opinion." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). An ALJ may not "reject evidence for no reason or the wrong reason," *id.* (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)), but that has not happened when the ALJ "clearly explain[s] why she gave greater weight to the opinion" she ultimately found more persuasive. *Brown*, 649 F.3d at 196.

Mr. Addy opined that Plaintiff had marked limitations in understanding and memory, sustained concentration and persistence, social interactions, and adaption. (R. 23). The ALJ found Addy's opinion unpersuasive because:

> [Plaintiff] has undergone only conservative mental health treatment, consisting of psychotropic medication management and therapy, without the need for emergency or inpatient treatment. Moreover, the claimant's treatment records revealed that his medications work well with no side effects. Records in 2018 also noted that the claimant had minimal issues with flashbacks, was generally able to control his anger issues, and even denied being depressed at times.

(R. 23).

The medical record supports the ALJ's findings regarding Plaintiff's mental impairments. As the ALJ explained, the record reflects large gaps in Plaintiff's treatment, including a period from 2012 to 2016 during which he was not receiving treatment for his mental health. (R. 21–22, 235–48, 371). Additionally, once Plaintiff began treating with GPHA, he reported that his medications were helping and did not cause him any side effects. (R. 298, 300, 303). Plaintiff also reported that, with treatment, his PTSD-related flashbacks were becoming less frequent and less intense, he was learning to control his anger, he slept well, and he experienced panic attacks less frequently. (R. 300, 302–03). While Plaintiff often presented with depressed mood, he showed normal results on mental status examination, including appropriate grooming, cooperative behavior, normal speech, appropriate thought patterns, and normal affect. (R. 275–

76, 281–82).  Because of this, the ALJ properly found Mr. Addy's opinion to be inconsistent with the rest of the medical record, and therefore unpersuasive.

Plaintiff does not dispute the ALJ's explanation of the objective medical evidence, but instead points to instances in the record that tend to show depressed mood.  (Pl.'s Br. 14–15, ECF No. 18).  But the Court may not "reweigh the evidence."  *Kushner*, 765 Fed. App'x at 828. Merely pointing to evidence that might support a contrary conclusion is not enough to overcome substantial evidence review.  *See Simmonds*, 807 F.2d at 58 ("While there is other evidence in the record that could support a finding of disability . . . , our inquiry is not whether the ALJ could have reasonably made a different finding based on this record.").

In light of this, the ALJ considered and adequately discussed the supportability and consistency of Mr. Addy's opinion and substantial evidence supports the ALJ's decision to find that opinion unpersuasive.  Accordingly, Plaintiff's request for review on this ground is denied.


## VI.    CONCLUSION

For the reasons set forth above, I find that substantial evidence supports the ALJ's physical and mental RFC determinations.  Accordingly, Plaintiff's request for review is **DENIED**.


BY THE COURT:


  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge


26